**A. O. SMITH CORPORATION et al.**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1282.**

**INLAND STEEL COMPANY**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1283.**

**NORTHWEST INDUSTRIES, INC.**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1284.**

**OSCAR MAYER & CO. INC.**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1285.**

**MERCK & CO., INC.**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1286.**

**HOBART CORPORATION**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1287.**

**The GOODYEAR TIRE & RUBBER COMPANY**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1288.**

**THOMAS J. LIPTON, INC.**

v.

**FEDERAL TRADE COMMISSION et al., Appellants in No. 75–1289.**

Nos. 75–1282 to 75–1289.

United States Court of Appeals, Third Circuit.

Argued Oct. 17, 1975.

Decided Feb. 11, 1976.

---

Adams, Circuit Judge, concurred in part and dissented in part and filed opinion.

W. Laird Stabler, Jr., U. S. Atty., Wilmington, Del., for appellants and Comptroller of the United States.

Robert J. Lewis, Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, James P. Timony, William A. Cerillo, Warren S. Grimes, Bruce G. Freedman, Mary L. Azcuenaga, Gerald P. Norton, Washington, D. C., for appellants, Federal Trade Commission.

Gilbert J. Helwig, Edward T. Tait, Lee A. Rau, John M. Wood, Reed, Smith, Shaw & McClay, Washington, D. C., Richard F. Corroon, Potter, Anderson & Corroon, Wilmington, Del., for appellee, A. O. Smith Corp., and others.

Robert L. Stern, Chicago, Ill., Frank P. Cihlar, Charles W. Petty, Jr., James R. Henderson, Mayer, Brown & Platt, Washington, D. C., for appellees, Inland Steel Co., Northwest Industries, Inc. and Oscar Mayer & Co. Inc.

Philip A. Lacovara, Gerald Goldman, Hughes, Hubbard & Reed, Washington, D. C., for appellee, Merck & Co., Inc.

John F. McClatchey, Leslie W. Jacobs, Thompson, Hine & Flory, Cleveland, Ohio, for appellees, Hobart Corp., The Goodyear Tire & Rubber Co.

Paul P. Welsh, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., David W. St. Clair, Charles H. McAuliffe, Englewood Cliffs, N. J., for appellee, Thomas J. Lipton, Inc.

Before ALDISERT, KALODNER and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

We are to decide whether the district court had jurisdiction to entertain pre-enforcement suits for declaratory and injunctive relief against the Federal Trade Commission[1] and, if so, whether the court erred in refusing to dismiss the complaint or in granting a preliminary injunction. After hearing, the district court preliminary enjoined the Commission from giving notice of default to appellees for failure to file Annual Line of Business Reports and from enforcing civil penalties for appellees' failure to file the reports. *A. O. Smith Corp. v. FTC,* 396 F.Supp. 1108 (D.Del.1975) ("*A. O. Smith I*"); *A. O. Smith Corp. v. FTC,* 396 F.Supp. 1125 (D.Del.1975) ("*A. O. SMITH II*"). This appeal followed. We conclude that the district court had jurisdiction, but that it erred in granting preliminary injunctive relief.

Prompted by what it considered the inadequacies of existing corporate financial reporting, the Bureau of Economics recommended in 1970 that the Commission exercise its authority to require meaningful public reporting of financial information on a divisional basis as an extension of the existing Quarterly Financial Reports program. In March of 1974, the Commission submitted its proposed Line of Business (LB) Reports Form to the Comptroller General pursuant to 44 U.S.C. § 3512. The forms require, *inter alia,* detailed sales and cost data broken down into line of business categories as defined by the Commission. Finding specifically that the "information sought in the FTC LB proposal is not presently available from another source within the Federal government," the Acting Comptroller General approved the LB form, with certain provisions not here relevant, on May 13, 1974.

On August 2, 1974, the FTC adopted a resolution putting the program into effect. This resolution, which later appeared in the Federal Register, stated in part that "continuing and current financial data and statistics from corporations within the various industries and lines of commerce of the United States" were "necessary for the proper functioning of the government". 39 Fed.Reg. 30377 (1974). Pursuant to the resolution, the Commission ordered 345 of the nation's largest companies to complete and file LB reports. The orders required that

---

1. The individual Commissioners and the Comptroller General of the United States were also named as defendants in the district court. The injunction ran against the FTC and the individual Commissioners. No preliminary relief was sought against the Comptroller General. Accordingly, when we use the term "Commission" in the context of this appeal, we refer to the collective interests of all appellants.

reports be filed within 150 days of receipt of the orders which were served during August 1974. The orders concluded: "You are advised that penalties may be imposed under applicable provisions of Federal law for failure to file this report or for the filing of a false report." App. at 328. About 250 of the companies filed timely motions to quash the LB orders; these motions were denied. Renewed and amended motions to quash followed. On January 7, 1975, the FTC denied all motions to quash. *Ibid.* at 99–106.

Seven corporations, the appellees at No. 75–1282, filed suit in the district court on January 22, 1975, seeking pre-enforcement declaratory and injunctive relief. They alleged, *inter alia*, lack of statutory authority to issue the LB orders, undue burden on the companies to comply with the orders, and failure of the Commission to promulgate the orders in accordance with the procedures for rule making prescribed by the Administrative Procedure Act. They also asserted various constitutional grounds. Six other companies, appellees at Nos. 75–1283/8, filed similar actions on February 14, 1975. Appellee at No. 75–1289 filed its action on February 24, 1975, seeking virtually the same relief. The Commission moved to dismiss the complaints; the companies moved for preliminary injunctions against enforcement of the LB orders. The district court denied the Commission's motion, and granted the corporations' motions, entering preliminary injunctions on February 19 (*A. O. Smith I*) and March 18, 1975 (*A. O. Smith II*). The Commission's appeals from both orders have been consolidated before us.

On appeal, the Commission advances alternative theories for reversal. First, it argues that the district court did not have jurisdiction to entertain this pre-enforcement suit, because the FTC Act provides for counter-enforcement procedures which afford a party challenging an FTC order with an adequate remedy. *See* 15 U.S.C. § 49. Next, the Commission contends that, if the district court had jurisdiction, it should have declined to exercise that jurisdiction, because the

controversy was not yet ripe for judicial resolution. Finally, the Commission urges that the district court erred in preliminarily enjoining the Commission from giving notice of default and from enforcing penalties for failure to file. Here, the FTC particularly controverts the district court's conclusion that appellees established a probability of succeeding with the merits of their rule-making claims; the Commission contends that its LB orders were issued pursuant to Section 6 of the FTC Act, 15 U.S.C. § 46, and were not subject to the rule-making provisions of the Administrative Procedure Act, 5 U.S.C. § 553. The Commission also challenges the issuance of the preliminary injunction on the ground that appellees failed to prove they would be irreparably harmed absent the injunction.

We conclude that the district court had jurisdiction; that it properly exercised that jurisdiction because the controversy was ripe for judicial resolution; but that it erred in issuing the preliminary injunction because appellees failed to establish irreparable harm. Accordingly, we neither reach, nor express an opinion on, the question whether appellees demonstrated a probability of succeeding on the merits of their claim that the APA's rule-making provisions applied to the issuance of the LB orders.

I.

Appellants' initial argument is that the district court had no jurisdiction to entertain pre-enforcement complaints challenging the LB orders. At the outset, we note that the district court held that it had federal question jurisdiction under 28 U.S.C. § 1331, or, alternatively, jurisdiction under 28 U.S.C. § 1337. *A. O. Smith I, supra,* 396 F.Supp. at 1113; *see* Tr. Oral Arg. at 44–45. Appellants do not contest these rulings. In any event, we would agree with the district court. Thus, this case is distinguishable from *West Penn Power Co. v. Train,* 522 F.2d 302 (3d Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3417 (U.S. Jan. 9, 1976) (No. 75–974), the primary holding of which was that the district court had

not erred in dismissing the complaint because there was no independent jurisdictional predicate. *Compare ibid.* at 308 n. 26 & 309–10 (majority opinion) *with ibid.* at 321 n. 42 (Adams, J., dissenting).

Instead, appellants' first contention proceeds from recognition that the LB orders were issued pursuant to Section 6(b) of the FTC Act, 15 U.S.C. § 46(b), and, as such, were not self-enforcing. Rather, the legislative scheme calls for the Commission to enforce the LB orders by using the procedures set forth in Sections 9 and 10 of the Act, 15 U.S.C. §§ 49, 50. Under Section 9 the Commission may petition the court for an order in the nature of mandamus to compel the filing of a report; Section 10 provides for the issuance of notices of default, and for the accrual of civil penalties of $100 a day for each day of default after the thirtieth day following receipt of the notice. Accordingly, appellants argue that, until the FTC seeks to enforce its orders, the district courts are without jurisdiction to entertain actions for declaratory and injunctive relief.

In this argument, appellants rely on *FTC v. Claire Furnace Co.*, 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978 (1927), as modified by the holding in *St. Regis Paper Co. v. United States*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961). These cases, appellants contend, stand for the

proposition that, unless a notice of default has issued, there can be no judicial review of an FTC order issued pursuant to Section 6(b) until the Commission moves for enforcement under Section 9. *See, e. g., Genuine Parts Co. v. FTC*, 445 F.2d 1382 (5th Cir. 1971).[2] Since the Commission had not moved effectively for enforcement of the LB orders against any of the instant appellees, *see A. O. Smith I, supra*, 396 F.Supp. at 1112; *A. O. Smith II, supra*, 396 F.Supp. at 1129, appellants urge that the district court had no jurisdiction to hear the cases.

The appellees' response is that the *Claire Furnace-St. Regis* formula no longer controls. They point out that *Claire Furnace* antedated the Declaratory Judgment Act by some seven years and the Administrative Procedure Act by some 19 years. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 142 and nn. 4–6, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Most important, contend appellees, the paramount principles today in deciding whether federal courts have jurisdiction to review administrative actions derive from the Supreme Court's 1967 *Abbotts Laboratories* trilogy,[3] recently reaffirmed in *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). The district court agreed with appellees. So do we.[4] Accordingly, we turn to an analysis of the legal precepts Justice

---

2. Supporting its thesis that actions may not be maintained against the Commission prior to the issuance of notices of default, appellants find analogies in cases implicating attempts to enjoin the enforcement of summons issued by the Internal Revenue Service, *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964), or of subpoenas issued by grand juries, *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (3d Cir. 1973). We agree with appellees that enforcement of administrative summons, or grand jury subpoena, cases do not reach the fundamental questions raised in this appeal.

3. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697; *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704. Professor Davis calls *Abbott Laboratories* "the overshadowing case". K. Davis, Administrative Law Text § 21.04, at 404 (1972).

4. As we must be cognizant of the present vitality of many rules enunciated by old and venerable cases, we must also be alert to Roscoe Pound's observation: "Now, the fact is, as far as rules are concerned, the life of a rule of law in the strict sense is relatively short. I had occasion in 1924, at the request of a committee of the American Bar Association, to investigate the reports beginning in 1774, at intervals of fifty years, down to 1924, and the thing that struck me as I went on with that, and could be shown conclusively as I had finished it, was that the general run of rules of law . . . had a life of simply one generation. Fifty years is a long life for a rule, that is, a legal precept that attaches a definite detailed legal consequence to a definite detailed state of facts. And it is with rules, very largely, that this doctrine of *stare decisis* has its immediate application." Pound, *Survey of the Conference [on the Status of the Rule of Judicial Precedent] Problems*, 14 U.Cin.L.Rev. 324, 329 (1940). *See also* Pound, *Hierarchy of*

Harlan articulated in *Abbott Laboratories* and their application to the facts at hand.

The fundamental jural lesson flowing from *Abbott Laboratories* is this: a person aggrieved by final agency action may come to federal court for judicial review "so long as [*a*] no statute precludes such relief or [*b*] the action is not one committed by law to agency discretion." 387 U.S. at .140, 87 S.Ct. at 1511. Appellants do not claim applicability of either exception; nor do we find one obtained. As the Supreme Court said in *Abbott Laboratories*, and reiterated last term in *Dunlop v. Bachowski*,[5] "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Ibid.* 387 U.S. at 141, 87 S.Ct. at 1511, repeated in *Dunlop v. Bachowski, supra,* 421 U.S. at 567, 95 S.Ct. 1851; *see, e. g., Pollard v. Romney,* 512 F.2d 295, 298 (3d Cir. 1975).[6] We have examined the FTC Act and find no clear and convincing evidence of a congressional intent to bar judicial review of final FTC orders under Section 6(b). For this reason, appellants' reliance on *Getty Oil Co. (Eastern Operations), Inc. v. Ruckelshaus,* 467 F.2d 349 (3d Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973), is misplaced. There, we held that Section 307 of the Clean Air Act demonstrated a clear congressional intent to limit judicial review of the Environmental Protection Administrator's actions to the courts of appeals. Accordingly, we concluded that the district court was without jurisdiction to entertain a suit seeking to enjoin enforcement of an EPA compliance order: Getty had sought judicial review in the wrong court. See *ibid.* at 356, 357–58 n. 14.

### II.

A second teaching of *Abbott Laboratories* is that, where the party aggrieved seeks injunctive and declaratory relief as here, since those remedies are discretionary, the court should hesitate to apply them unless (a) the issues are fit for judicial resolution and (b) withholding judicial consideration would result in hardship to the parties. *Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. 1507. As Judge McGowan recently observed, this law of "ripeness", once a tangled web of special rules and distinctions, is since *Abbott Laboratories* "very much a matter of practical common sense." *Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 18, 522 F.2d 107, 124 (1975).

### A.

In assessing the fitness of the challenge to FDA actions for judicial decision, Justice Harlan looked to two factors: (1) the nature of the issues, which he denominated "purely legal", *Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. 1507, and (2) the finality of the agency actions. These guidelines are consonant with the underlying rationale for the ripeness doctrine—"to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized . . . ." *Ibid.* at 148, 87 S.Ct. at 1515. *See also Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

Here, the ultimate issues raised by appellees' challenges to the LB orders are purely legal: whether the promulgation of the LB resolution exceeded the Commission's authority or was in the nature of an administrative rule so as to require prior compliance with rule-making procedures specified in the APA. Further factual development would not sharpen the issues; nor does judicial considera-

---

*Sources and Forms in Different Systems of Law,* 7 Tul.L.Rev. 475, 482–86 (1933).

5. The reiteration of this principle in *Dunlop* deflates any force that might otherwise have attached to appellants' argument that *Abbott Laboratories* applied only to FDA orders.

6. The Court thus extended the presumption of reviewability, "disregard[ing] the fact that judicial scrutiny eventually would have been available in enforcement proceedings." *The Supreme Court, 1966 Term,* 81 Harv.L.Rev. 110, 227 (1967).

tion at this stage in any way usurp the Commission's fact-finding prerogatives.

■ The FTC's action requiring LB reports was also final. The LB orders issued to the individual companies, including all appellees, warned specifically of applicable civil fines for failure to file or for filing a false report. *See* page 10, *supra*. Before appellees filed their complaints, the Commission had denied initial, renewed and amended motions to quash. During the course of this litigation there has not been a hint that the FTC intended to compromise the orders; rather, appellants have steadfastly conveyed the impression that they desire full and prompt compliance with the LB program. Thus, viewing the matter pragmatically, we have no hesitancy in concluding that the LB orders were final and, therefore, fit for judicial review.

### B.

■ In measuring ripeness from the standpoint of whether withholding judicial review would result in hardship to the parties, the Supreme Court requires that the impact on the complaining party be "sufficiently direct and immediate." [7] *Abbott Laboratories, supra*, 387 U.S. at 152, 87 S.Ct. 1507. As the Court elaborated:

Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance . . . .

*Ibid.* at 153, 87 S.Ct. at 1518. *See generally*, K. Davis, Administrative Law Text § 21.04, especially at 404–06 (1972).

---

**7.** That a challenge to administrative action will not be fit for judicial review unless there is an impact on the challenger derives in part from the Article III requisite for a live case or controversy. *See generally Warth v. Seldin*, 422 U.S. 490, especially at 498–502 and n. 10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, in

One reason for scrutiny of the "hardship to the parties" aspect of the ripeness formula is that the factual complex—but not necessarily all of it—relevant to hardship will also be relevant to the question of "irreparable injury" which must be satisfied, should it be reached, before an injunction may issue. We perceive the two concepts—"hardship to the parties" and "irreparable injury"—to be jurisprudential cousins, not identical twins. The same analytical factors may or may not support each concept; the context in which the factors are utilized is critical. Thus, certain factors will dominate in considering hardship to the parties, while different factors may be critical in considering irreparable injury for purposes of issuing a preliminary injunction; still other factors may come into play when irreparable harm is considered in the context of a request for a permanent injunction.

Another reason for careful analysis in this area is that not every impact will be sufficiently direct and immediate. This much is clear from the *Abbott Laboratories* trilogy. There, the Court differentiated among the factual complexes presented to it. At issue in *Abbott Laboratories* was an FDA order "requiring labels, advertisements, and other printed matter relating to prescription drugs to designate the established name of the particular drug involved every time its trade name is used anywhere in such material." 387 U.S. at 139, 87 S.Ct. at 1510. The Court found the impacts sufficiently direct and immediate:

These regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. As the District Court found on

actuality, there can be no bright line of demarcation between constitutional requirements and the equitable and discretionary standards Justice Harlan discussed in *Abbott Laboratories*. Suffice it to say that ours is not a constitutional analysis.

the basis of uncontested allegations, "Either they must .comply with the every time requirement and incur the costs of changing over their promotional material and labeling or they must follow their present course and risk prosecution." 228 F.Supp. 855, 861. The regulations are clear-cut, and were made effective immediately upon publication; as noted earlier the agency's counsel represented to the District Court that immediate compliance with their terms was expected. If petitioners wish to comply they must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance—continued use of material which they believe in good faith meets the statutory requirements, but which clearly does not meet the regulation of the Commissioner—may be even more costly. That course would risk serious criminal and civil penalties for the unlawful distribution of "misbranded" drugs.

It is relevant at this juncture to recognize that petitioners deal in a sensitive industry, in which public confidence in their drug products is especially important. To require them to challenge these regulations only as a defense to an action brought by the Government might harm them severely and unnecessarily.

*Ibid.* at 152–53, 87 S.Ct. at 1517–1518 (footnotes omitted). In *Gardner v. Toilet Goods Ass'n, supra*, the challenge was to FDA regulations regarding color additives and hair dyes. The Color Additive Amendments of 1960 had allowed the FDA to prescribe conditions for the use of color additives, requiring clearance and certification of each "batch" of each additive. 21 U.S.C. §§ 321(t), 376. Two of the challenged regulations included as color additives substances alleged to fall outside the statutory definition. 21 C.F.R. § 8.1(m) (1967) (diluents); 21 C.F.R. § 8.1(f) (1967) ("Lipstick, rouge, eye makeup colors, and related cosmetics intended for coloring the human body"). A statutory exemption for hair dyes

bearing a designated cautionary label, 21 U.S.C. § 361(a), (e), was alleged to be undercut by a third regulation, 21 C.F.R. § 8.1(u) (1967). Again, the Court found sufficiently direct and immediate impacts:

Faced with these regulations the respondents are placed in a quandary. On the one hand they can, as the Government suggests, refuse to comply, continue to distribute products that they believe do not fall within the purview of the Act, and test the regulations by defending against government criminal, seizure, or injunctive suits against them. We agree with the respondents that this proposed avenue of review is beset with penalties and other impediments rendering it inadequate as a satisfactory alternative to the present declaratory judgment action.

. . . . .

[I]f respondents, failing judicial review at this stage, elect to comply with the regulations and await ultimate judicial determination of the validity of them in subsequent litigation, the amount of preliminary paper work, scientific testing, and recordkeeping will be substantial.

387 U.S. at 172–73, 87 S.Ct. at 1529. On the other hand, in *Toilet Goods Ass'n v. Gardner, supra*, the challenge was to a regulation providing that if a person refused to permit authorized FDA employees access to regulated manufacturing facilities, the FDA might suspend certification service to that person. The Court found a want of ripeness, noting:

This is not a situation in which primary conduct is affected—when contracts must be negotiated, ingredients tested or substituted, or special records compiled. This regulation merely states that the Commissioner may authorize inspectors to examine certain processes or formulae . . . . Moreover, no irremediable adverse consequences flow from requiring a later challenge to this regulation by a manufacturer who refuses to allow this type of inspection. Unlike the

other regulations challenged in this action, in which seizure of goods, heavy fines, adverse publicity for distributing "adulterated" goods, and possible criminal liability might penalize failure to comply, see *Gardner v. Toilet Goods Assn., post,* 387 U.S. p. 167, [87 S.Ct. 1526, 18 L.Ed.2d 704], a refusal to admit an inspector here would at most lead only to a suspension of certification services to the particular party . . . .

387 U.S. at 164–65, 87 S.Ct. at 1524–1525.

▇ Thus, it appears from the *Abbott Laboratories* trilogy that one seeking discretionary relief may not obtain pre-enforcement judicial review of agency action if there is no immediate threat of sanctions for noncompliance, or if the potential sanction is de minimis. Conversely, the court should find agency action ripe for judicial review if the action is final and clear-cut, and if it puts the complaining party on the horns of a dilemma: if he complies and awaits ultimate judicial determination of the action's validity, he must change his course of day-to-day conduct, for example, by undertaking substantial preliminary paper work, scientific testing and record-keeping, or by destroying stock; alternatively, if he does not comply, he risks sanctions or injuries including, for example, civil and criminal penalties, or loss of public confidence.

▇ In this case, the LB order issued to each of the appellees was clear-cut. As previously rehearsed, there was never any doubt but that the FTC contemplated full and prompt compliance. By the time appellees filed suit, the agency action requiring the LB reports was final:

the Commission had denied original motions to quash, as well as renewed and amended motions. Appellees were placed in an immediate and real quandary: if they chose to comply with the LB orders, as more than 200 companies did, they would have had to commit substantial resources—both in terms of money and manpower—to develop accounting techniques necessary for compliance and, as a result, suffer loss of profits; [8] alternatively, they could refuse to comply, await FTC enforcement and risk civil fines for noncompliance. *See A. O. Smith I, supra,* 396 F.Supp. at 1115–16.[9] Thus, the potential harm to appellees seems to fall between the de minimis sanction in *Toilet Goods Ass'n v. Gardner, supra,* and the draconian alternatives faced in *Gardner v. Toilet Goods Ass'n, supra,* and *Abbott Laboratories v. Gardner, supra.* We have determined that these facts more closely approximate those in *Gardner* and *Abbott Laboratories* than those in *Toilet Goods.* Here, the consequences of noncompliance are serious and the effects of compliance on primary day-to-day conduct are immediate. At the very least, the LB orders necessitate changes in internal recordkeeping and accounting. The Supreme Court has acknowledged that such an impact may be sufficiently direct and immediate for ripeness purposes. *Compare Toilet Goods Ass'n v. Gardner, supra,* 387 U.S. at 164, 87 S.Ct. 1520, *with Gardner v. Toilet Goods Ass'n, supra,* 387 U.S. at 173, 87 S.Ct. 1526.

Accordingly, we hold that the district court did not err either in determining that it had jurisdiction to entertain the complaints or in using its discretion to exercise jurisdiction, because the contro-

---

**8.** The controller of one corporation had estimated compliance with the LB order would require eight months and an expenditure of about $400,000. Tr. Oral Arg. at 20. Other estimates of the cost of compliance exceeded one million dollars per corporation. *See A. O. Smith I, supra,* 396 F.Supp. at 1118.

**9.** The district court relied in part on the possibility of criminal sanctions as well. *See A. O. Smith I, supra,* 396 F.Supp. at 1116 & n.12. At oral argument, the Commission asserted that criminal sanctions could not be imposed

on appellees because the LB orders were directed to the corporations—not their officers—and the criminal penalties of Section 10 do not apply to corporations. *See, e. g.,* Tr. Oral Arg. at 17. While we agree that the criminal provisions of Section 10 would not obtain against the corporations before us, this does not mean that Section 10 criminal penalties do not lurk in the background. In any event, because of the view we take of the non-criminal impacts of the LB orders, the Commission's point need not detain us.

versy surrounding the FTC's action was ripe for judicial decision. The only question remaining is whether the district court committed reversible error in issuing preliminary injunctions.

### III.

In reviewing the grant or denial of preliminary injunctions over the years, this court has emphasized the following considerations:

1. The law has entrusted the power to grant or dissolve an injunction to the discretion of the trial court in the first instance, and not to the appellate court. *Stokes v. Williams,* 226 F. 148, 156 (3d Cir. 1915), *cert. denied,* 241 U.S. 681, 36 S.Ct. 728, 60 L.Ed. 1234 (1916).

2. Unless the trial court abuses that discretion, commits an obvious error in applying the law, or makes a serious mistake in considering the proof, the appellate court must take the judgment of the trial court as presumptively correct. *Ibid; see Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975); *United States v. Ingersoll-Rand Co.,* 320 F.2d 509, 523 (3d Cir. 1963).

3. "This limited review is necessitated because the grant or denial . . . is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *United States Steel Corp. v. Fraternal Ass'n of Steelhaulers,* 431 F.2d 1046, 1048 (3d Cir. 1970).

4. In exercising its limited review of the grant or denial of preliminary injunctive relief, the appellate court asks: (a) Did the movant make a strong showing that it is likely to prevail on the merits? (b) Did the movant show that, without such relief, it would be irreparably injured? (c) Would the grant of a preliminary injunction substantially have harmed other parties interested in the proceedings? (d) Where lies the public interest? *Commonwealth of Pennsylvania ex rel. Creamer v. United States Dep't of Agriculture,* 469 F.2d 1387, 1388

n.1 (3d Cir. 1972) (per curiam); *Croskey Street Concerned Citizens v. Romney,* 459 F.2d 109, 112 (3d Cir. 1972) (concurring opinion). Also see *Oburn v. Shapp, supra,* 521 F.2d at 147; *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974).

5. "The applicant for a preliminary injunction bears the burden of establishing a right to such injunctive relief and that irreparable injury will result to him if it is not granted." *Bancroft & Sons Co. v. Shelley Knitting Mills, Inc.,* 268 F.2d 569, 574 (3d Cir. 1959) (footnote omitted). Moreover, we have emphasized "the elementary principle that a preliminary injunction shall not issue except upon a showing of irreparable injury." *National Land & Investment Co. v. Specter,* 428 F.2d 91, 97 (3d Cir. 1970).

In examining claimed aspects of the irreparable injury that would befall appellees in the absence of an injunction pendente lite, two other factors command our attention. First, as previously rehearsed, irreparable harm, as a concept to be considered in the context of a preliminary injunction, is related to, but not the equivalent of, the hardship-to-the-parties ingredient of the *Abbott Laboratories* ripeness test. Second, the requisite is that the feared injury or harm be irreparable—not merely serious or substantial. "The word means that which cannot be repaired, retrieved, put down again, atoned for. . . . Grass that is cut down cannot be made to grow again; but the injury can be adequately atoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it . . . ." *Gause v. Perkins,* 3 Jones Eq. 177, 69 Am.Dec. 728 (1857). "Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate." *Danielson v. Local 275, Laborers Union,* 479 F.2d 1033, 1037 (2d Cir. 1973). *See generally* E. Re, Cases and Materials on Equity and Equitable Remedies 1018–35 (1975).

Against this backdrop we consider first whether the trial court erred when

it concluded that the appellees had met their burden of proving they would suffer irreparable harm or injury in the absence of an injunction pendente lite. The district court in *A. O. Smith I* stated:

> The alleged injury suffered by plaintiffs goes either to the unrecoverable costs and commitment of diverse business resources including managerial talent with concomitant loss of profits incident to preparation and compliance with the Commission orders plaintiffs assert to be invalid, or in the event of noncompliance, irreparable harm threatened by criminal and civil sanctions. The immediacy of the injury is evident; plaintiff has already incurred some costs incident to compliance and the time constraints placed upon plaintiffs by the FTC are narrow. The Court concludes plaintiffs will suffer immediate, irreparable injury.

396 F.Supp. at 1118. In its second opinion, the district court amplified:

> Defendants correctly point out that the availability of discovery in summary enforcement proceedings is not categorically foreclosed to either party. Rather, the court to which enforcement application is made has discretion to allow as much discovery as is consistent with the need for expeditious adjudication of the issues before it. *See FTC v. Kujawski,* 298 F.Supp. 1288, 1290 (N.D.Ga.1969); *cf. Venn v. United States,* 400 F.2d 207, 212 n.12 (5th Cir. 1968); *United States v. Moriarity,* 278 F.Supp. 187 (E.D.Wis.1967). This, however, introduces an element into a court's decision to allow discovery in a summary enforcement context which is not present in a plenary pre-enforcement action, i. e., the "tension between speedy adjudication and fairness to the investigated party." *FTC v. Kujawski,* 298 F.Supp. at 1290.

> In the Court's view, it is this tension which renders plaintiffs' remedy by way of summary enforcement suit inadequate *vis-a-vis* plenary pre-enforcement proceedings. In the context of a summary enforcement suit in which a prompt determination of the need for

compliance with an administrative order is demanded, a court may be understandably ill-disposed to grant requests for discovery which would be otherwise permissible in a plenary civil action. *See, e. g., United States v. Associated Merchandising Corp.,* 256 F.Supp. 318 (S.D.N.Y.1966).

> This is not to say that a pre-enforcement injunction may issue in every instance in which there appears the possibility that discovery in a pending enforcement proceeding may be limited. Where, as here, however, plaintiffs are able to demonstrate a likelihood of success on the merits and may need the panoply of discovery devices envisioned by the Federal Rules if they are ultimately to carry the burden of persuasion, this Court may invoke its equitable powers to afford the discovery needed.

> Given the foregoing considerations and in view of plaintiffs' demonstrated need for full discovery on several issues, the Court reiterates that the mandamus proceedings contemplated by the Commission are not an adequate vehicle for the adjudication of rights plaintiffs here assert. Accordingly, . . . the Court concludes plaintiffs will suffer immediate irreparable injury.

*A. O. Smith II, supra,* 396 F.Supp. at 1134–35 (footnotes omitted). Thus, in concluding that appellees would suffer irreparable injury absent an injunction pendente lite, the district court relied on consideration of: (a) the asserted difference in the scope of discovery available in a pre-enforcement, as opposed to a counter-enforcement, action; (b) "the unrecoverable costs and commitment of diverse business resources . . . incident to preparation and compliance with the Commission orders"; and (c) potential criminal and civil sanctions for noncompliance or faulty compliance.

### A.

We may begin by conceding that the scope of discovery in a summary enforcement proceeding *might* be different from that in a plenary suit, just as it

*might* be different if the suit were heard in district A instead of district B, or before judge X instead of judge Y. However, we could hardly elevate such a speculative and fortuitous procedural variance to the status of irreparable harm without seriously—perhaps irreparably—undermining the salutary limitation that concept places on the exercise of the injunctive power. Further, we agree with the district court that the availability of discovery in a summary enforcement proceeding is not foreclosed to either party. Whether the matter is litigated now or later, the companies' position will be the same—an attack on the FTC's institution of the LB program: the companies will insist that the full panoply of rule-making procedures apply, while the FTC will contend that its resolution was not rule making but permissible report gathering under Section 6 of the FTC Act. In either case, the compass of available discovery is circumscribed by the requirement that discovery be "relevant to the subject matter involved in the pending action", F.R. Civ.P. 26(b)(1), and not by the form of the action. In either action, discovery may be "limited by order of the court", F.R.Civ.P. 26(b). If the action is a summary enforcement under Section 9, there may be a " 'tension between speedy adjudication and fairness to the investigated party' ", *A. O. Smith II, supra,* 396 F.Supp. at 1134, suggesting that bounds to discovery be set. On the other hand, if the action is for pre-enforcement review, as here, the district court must bear in mind that what is to be reviewed is administrative agency action entitled to some judicial deference; accordingly, full, unbridled discovery may be inappropriate. *Cf. Dunlop v. Bachowski,* 421 U.S. 560, 571, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). Indeed, in this pre-enforce-

ment action, the district court has limited the scope of appellees' discovery. We conclude, therefore, that the possible variation between the scope of discovery available to appellees in this action and the scope of discovery that would be available to them in defending a later enforcement action does not constitute irreparable harm for purposes of a preliminary injunction. Our conclusion that the variation is only possible necessarily encompasses a determination that, in any event, appellees failed to carry their burden on this aspect of their claimed irreparable injury.

### B.

In *A. O. Smith I, supra,* the district court alluded to the claim of unrecoverable costs of compliance as an element of irreparable injury. In the context here presented, we find that this asserted harm did not constitute irreparable injury. At issue was a *preliminary* injunction—a form of relief requiring a strong showing of necessity. Furthermore, the alleged injury was "unrecoverable costs and commitment of diverse business resources." Without intending to disparage the importance of such an injury, we observe that all that is lost is profits. Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way, "peculiar".[9a] *See Gause v. Perkins, supra.* These are not "small" corporations; there is no contention that compliance with the LB program would render any appellee unable to meet its debts as they

<hr>

**9a.** We have not here attempted "to fashion a general rule—applicable to other factual situations . . .," as inferred in the instant concurring opinion. We formulate only a specific rule,—we draw a "definite detailed legal consequence" from "a definite detailed state of facts." Pound, *Hierarchy of Sources and Forms in Different Systems of Law,* 7 Tul.L. Rev. 475, 482 (1933). We do not subscribe to the concurring opinion's interpretation, *post*

n.2, that we would require as a minimum showing for purposes of proving irreparable harm in the pendente lite context "a corporate liquidity crisis or significant changes in company operations." Nor do we subscribe to the concurring opinion's implication that statistical figures from government reports can never serve as an evidentiary predicate for a finding of irreparable harm.

come due. Nor is there any contention that the cost of compliance would be so great *vis à vis* the corporate budget that significant changes in a company's operations would be necessitated. Nor is this a case where compliance would permanently injure the corporation's reputation, or its goodwill. If, in the final analysis, the Commission's authority to order the reports is upheld, the cost of compliance will have to be considered·a necessary business expense, albeit government mandated, and not a loss of profits in any usual sense of that term.

Moreover, even assuming that the asserted harm could, in these circumstances, constitute irreparable injury, the district court's summary conclusion on the irreparable harm issue is unsupported by basic findings of fact. The district court's opinion made reference to the median cost of compliance ($50,000) and to estimates that some companies might have to expend in excess of one million dollars in preparing LB reports. *A. O. Smith I, supra,* 396 F.Supp. at 1118. But it did so in the context of discussing the public interest, not irreparable injury. Moreover, the sources of these figures were government reports,[10] not specific evidence submitted by appellees. *See* App. at 48, 100. In *A. O. Smith II, supra,* on the other hand, the district court did not even mention the claim of unrecoverable costs in its analysis of irreparable injury.

At this juncture, we hasten to add that we do not reach the question of whether, if proved at final hearing, loss of profits from compliance with the LB

orders could constitute irreparable injury in the context of a permanent injunction.[11] We specifically reserve that issue for another day.

### C.

The district court's reliance on the possibility of civil fines—in the amount of $100 a day to commence 30 days after the FTC served a notice of default—was also misplaced. The appellees, as previously noted, are not "small" corporations. The FTC resolution to require LB reports stemmed from recommendations in a memorandum from Russell C. Parker, Assistant to the Bureau of Economics, reprinted in "Role of Giant Corporations," *Hearings Before the Subcommittee on Monopoly of the Senate Select Committee on Small Business,* 92d Cong., 1st Sess. Pt. 2A at 1807–17 (1972). Nor, as previously stated, are we confronted with a situation where any appellee has proved that compliance with the LB program would render it unable to meet its debts as they come due.[12] In these circumstances, we conclude that the threat of civil penalties was de minimis; in the context of the required showing for a preliminary injunction it did not rise to the level of irreparable injury.

Finally, in assessing irreparable injury, the district court alluded to possible criminal penalties. Appellants vehemently contend that appellees are not subject to criminal sanctions. *See* n.9 *supra.* Whatever the merit of appellees' rebuttal to that argument as it affects ripeness, the brute fact is that, in the context of the irreparable injury element

---

**10.** The median cost figure was contained in the Commission's memorandum in support of its denial of all motions to quash. App. at 100. The estimates of compliance costs exceeding one million dollars originated in the Comptroller General's evaluation of the LB program. The latter report, in turn, was based on submissions from several companies, including several appellees, *see* App. at 56–57, but none of the appellees at No. 75–1282 was among the companies whose estimates of cost the Comptroller General summarized, *see* App. at 48.

Appellees submitted affidavits and adduced testimony which might have supported a specific finding on the point, but the district court

did not predicate its conclusion of irreparable injury on those materials.

**11.** Although certain references have been made to the application for a permanent injunction, we note that appellees also sought declaratory relief. For similarities and differences in standards relating to injunctive and declaratory relief *see Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Samuels v. Mackell,* 401 U.S. 66 (1971); *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

**12.** We express no opinion on whether a different rule might obtain in circumstances different from those before us.

requisite to a preliminary injunction; appellees have failed to prove that absent an injunction pendente lite *they* would be subject to criminal sanctions.

██ Accordingly, we hold that the district court erred in finding that appellees had sustained their burden of proving irreparable injury. Such a finding is a necessary ingredient to the issuance of a preliminary injunction. *National Land & Investment Co. v. Specter, supra.* Therefore, the district court's order may not stand. Nor need we reach other issues tendered by the parties in this appeal, *viz.,* the appellees' likelihood of success on the merits, the effect of a preliminary injunction on other interested parties, or the public interest in the grant or denial of a preliminary injunction.

That part of the district court's order denying appellants' motion to dismiss the complaints for want of jurisdiction will be affirmed; that part granting preliminary injunctions will be vacated.

ADAMS, Circuit Judge (concurring):

I agree with parts I and II and with section C of part III of the majority opinion. In reversing the grant of the preliminary injunctions entered in this case, however, I would limit our holding to the failure of the plaintiffs to demonstrate, in the record before the district court, irreparable harm. Such a course would avoid the resolution of issues that need not be decided at this time.

Some cost of compliance with a Federal Trade Commission order is concededly inevitable, but the record here does not show with particularity the burden such compliance would impose upon the individual plaintiffs. To find irreparable harm in this regard the district court appears to have relied only on statistical figures from governmental reports.[1] A record this scanty is inadequate, in my judgment, to show irreparable injury by any standard. Thus, there does not appear to be any need for the Court to fashion a general rule—applicable to other factual situations—for determining whether the cost of compliance would inflict irreparable injury.[2]

Nor is there a basis in the record for concluding that differences in the extent of discovery, depending upon the type of proceeding available to the litigants, can never constitute irreparable harm.[3] The record in this case does not establish that mandamus proceedings would necessarily occasion a scope of discovery so much narrower than the scope of discovery available in this suit for injunctive relief that plaintiffs would be irreparably harmed thereby.

---

1. *See* majority opinion at 527 *supra.*

2. *Compare* majority opinion at 527 *supra.* I am not prepared to hold, at least on the basis of this record, that, short of provoking a corporate liquidity crisis or significant changes in company operations, cost of compliance can never be the basis of a finding of irreparable harm for the purpose of granting injunctive relief.

3. The plaintiffs contend that without a preliminary injunction they will be subjected to enforcement proceedings in the Southern District of New York. In that event, plaintiffs contend, discovery might be limited because enforcement by mandamus is a summary proceeding in which a court may curtail recourse to discovery that is otherwise available in plenary civil actions such as the present suit for injunctive relief.