John W. BERTOGLIO, James J. Ling, and Matrix, Inc., Plaintiffs,

v.

TEXAS INTERNATIONAL COMPANY, Defendant.

TEXAS INTERNATIONAL COMPANY, Counterclaimant,

v.

James J. LING, John W. Bertoglio, Texas International Company Stockholders Committee, and Hambro America Incorporated, Defendants on the Counterclaim.

Civ. A. No. 79–242.

United States District Court, D. Delaware.

May 29, 1979.

James S. Ramsey, Jr., and Richard Hull, Crutcher, Hull, Ramsey & Jordan, Dallas, Tex., for John W. Bertoglio, James J. Ling and Matrix, Inc.; A. Gilchrist Sparks, III, Martin P. Tully, Richard L. Sutton, and David A. Drexler, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., of counsel.

William Prickett, Prickett, Ward, Burt & Sanders, Wilmington, Del., Daniel S. Greenfeld, and Fred N. Gerard, Marshall, Bratter, Greene, Allison & Tucker, New York City, Fred Bartlit, J. Landis Martin, and David Springer, Kirkland & Ellis, Chicago, Ill., for Texas International Co.

Edmund N. Carpenter, II, Richards, Layton & Finger, Wilmington, Del., for Hambro America Inc.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Pending before the Court are cross-motions for preliminary injunction arising in the context of a battle over three seats on the Board of Directors of the defendant, Texas International Company ("TI"), and the adoption by TI of a "Stock Appreciation Rights Plan of 1979" ("SAR Plan"). The annual meeting of the shareholders at which the directors will be elected and the SAR Plan considered is scheduled for May 31, 1979.

The complaint, alleging several violations of § 14(a) of the Securities and Exchange Act of 1934 and the Securities and Exchange Commission's Rules 14a–3, 14a–9 and 14a–11, was filed by John W. Bertoglio, James J. Ling and Matrix, Inc., a Texas corporation (hereafter collectively referred to as "Ling-Bertoglio") on May 16, 1979. The following day TI, citing alleged violations of § 14(a) and Rules 14a–1, 9 and 11,

filed a counterclaim against Ling, Bertoglio, Hambro America Inc. (an investment banking house—"Hambro"),[1] and the Texas International Stockholders Committee ("Committee"), an entity organized by Ling and Bertoglio to submit a slate of director nominees in opposition to the management choices.[2] Thereafter on May 23rd, the plaintiffs filed an amendment to their complaint alleging additional factual underpinnings for their allegation that TI management has violated § 14(a) and the Commission's rules on the solicitation of proxies. In the interim, on or about May 17th, the Committee mailed its proxy statement to the shareholders. Two dates later, TI also communicated with its shareholders via a letter message from management and supplemental proxy materials.

Following a hearing on May 17th, the Court granted motions for expedited discovery, and a hearing on the cross-motions for preliminary injunctions was held on May 25th. Although Ling-Bertoglio initiated this action by seeking preliminarily to enjoin TI from "[p]ublishing, sending, or disseminating any materially false or misleading material to TEI stockholders in connection with the 1979 Annual Meeting of stockholders scheduled for May 31, 1979 [and] voting in person or by proxy any proxies . . . obtained in violation of Section 14(a) of the 1934 Act,"[3] their position changed dramatically at the May 25th hearing. In their written submission filed on the morning of the hearing, Ling-Bertoglio stated that they "do not seek to press their motion for preliminary injunctive relief unless the Court should conclude that there was some basis for granting preliminary relief to the defendant on its application to enjoin the further solicitation and voting of proxies by plaintiffs."[4] At the hearing, Ling-Bertoglio went further and

committed themselves to the position that even if they should win "the proxy contest, they will not exercise any rights as directors, including taking their seats or any other rights beyond that which they now have until such time as defendants have an opportunity to apply for preliminary injunctive relief and there is at least a decision on the merits on preliminary injunctive relief."[5]

In view of the change in the Ling-Bertoglio claim for relief, the threshold matter for this Court's attention became the counterclaim of TI for a preliminary injunction, which was vigorously pressed at the May 25th hearing. TI sought to enjoin *pendente lite* the counterclaim defendants from soliciting proxies and from voting both their proxies and their own shares at the May 31st meeting. Insofar as TI has sought an order enjoining further solicitation, it is obvious that this claim for preliminary relief is now moot. The delay resulting from the eleventh-hour filing of the complaint and counterclaim, combined with both sides' request for expedited discovery in preparation for the preliminary injunction hearing, have stripped the solicitation aspect of the request of its vitality. In order for proxies to be returned by ten a. m. on May 31st, three days after a legal holiday, the primary solicitation efforts would have had to occur by contact with shareholders prior to the May 28th legal holiday. For this Court to grant an injunction forbidding such solicitation two business days before the shareholders' meeting would be a futile exercise. As a consequence, TI's only meaningful request for injunctive relief is that seeking to enjoin the Committee from casting proxies allegedly obtained in violation of § 14 and its implementing rules and to prevent Ling-Bertoglio from voting their own shares at

---

1. The parties stipulated that no preliminary injunctive relief was sought against Hambro because it neither solicited nor intends to vote TI shares.

2. In their moving papers, defendants also sought a preliminary injunction against an alleged continuing violation of § 13(d) of the Exchange Act, 15 U.S.C. § 78m(d) and SEC

Rule 13d–1, 17 C.F.R. § 240.13d–1. The § 13 violations were not pursued at the preliminary injunction hearing.

3. Doc. No. 1, ¶ (C).

4. PX–4, Preliminary Statement of Position.

5. May 25, 1979 Transcript of Hearing, p. 24.

the May 31st meeting. Scheduled to be voted upon at that meeting are the "election of three directors to Class I of the board of directors to serve until the annual meeting of shareholders in 1982," [6] and the adoption of the SAR Plan.[7] A brief explanation of the structure of the Board of Directors and the SAR Plan is essential to an understanding of the prizes sought in the proxy contest.

The Board of Directors of TI consists of "not less than five nor more than 16 members as determined by resolution of the board or by the stockholders at any annual meeting." [8] The members of the Board serve staggered three-year terms. At present, the Board consists of ten members divided into three classes with the directors in Class II and Class III serving terms that will expire in 1980 and 1981 respectively.[9] The Class I directors, comprising three positions on the Board of Directors, are to be elected for a three-year term at the May 31st meeting.[10] The Ling-Bertoglio faction has offered Ling, Bertoglio and Ronald H. Shiftan, a General Partner in Bear Stearns

& Co.[11] ("Bear Stearns"), investment bankers, as proposed directors in opposition to the management slate. Management has proposed George Platt ("Platt"), President and Chairman of the Board of Directors, Delwin C. Stults ("Stults"), Executive Vice President, and Earl E. DeFrates ("DeFrates"), a Senior Vice President, to fill the three directorships. The individuals nominated on the management slate will also receive a total of 337,500 Stock Appreciation Rights if the SAR Plan is approved by the TI shareholders at the May 31st meeting.[12]

The SAR Plan and the rights granted pursuant thereto is a device to confer potential additional compensation in the form of cash or stock, or combination thereof, upon the recipients of the rights. The amount of SAR compensation is dependent upon the number of rights conferred and vested, and upon the dollar spread between the price of the TI stock at the time the rights were conferred ($8.875) and the higher of fair market value,[13] book value, or, if there has been a "Special Event" [14] within

6. Doc. 1, Exh. D, last page.

7. Review of opposing proxy solicitations indicates that there is no contest over a third item, selection of independent auditors.

8. Doc. 1, Exh. D, p. 2.

9. TI stated in its proxy materials, however, that management was considering the creation of two new directorships to be filled by nonemployees. Ling-Bertoglio allege in their amended complaint that offers of directorships had in fact been made to two specified individuals on May 7th and withdrawn on May 8. They further allege that management has considered placing the individual membership of its slate on the Board, in the event that slate loses the May 31st election.

10. Directors in Classes I, II and III serve three-year terms but remain members of the Board until their successors are duly elected and have qualified.

11. Bear Stearns has figured prominently in the Ling-Bertoglio plans for financing Gold Crown Resources, Inc., a corporation jointly owned by Ling and Bertoglio, which has allegedly made a proposal to purchase the assets or stock of TI at $18 per share or total consideration of approximately $170,000,000.

12. 500,000 Stock Appreciation Rights under the SAR Plan have been granted to five employees, with Platt scheduled to receive 175,000 rights, Stults 100,000 rights, and DeFrates 62,500 rights. As a group they have been granted 67.5% of the rights that will be created if the SAR Plan is approved.

13. Fair Market Value is defined in the SAR Plan as:

"Fair Market Value" means the higher of the closing price of one share of Common Stock on the New York Stock Exchange, or as quoted by another applicable quotation system, on the date prior to exercise or the highest price offered to purchase one share of Common Stock pursuant to any tender offer made or capable of acceptance during the four months prior to the exercise.
Doc. 1, Exh. D, p. 1–1.

14. "Special Event" is defined in the SAR Plan as follows:

"Special Event" means (i) the adoption by the Board of Directors of a plan of complete or partial liquidation of the Company; (ii) the adoption by the Board of Directors of the Company of a plan or merger, combination, consolidation, or other reorganization; (iii) the acquisition by ten or fewer persons, within any 24-month period, of at least 20% of the voting

twelve months prior to exercise of the Stock Appreciation Right, the appraised value. Under the SAR Plan, the occurrence of a "Special Event" not only affects the possible method of valuation of TI stock, but also the vesting of Stock Appreciation Rights. At the hearing, the parties were apparently in agreement that vesting ordinarily would take place at the rate of 10% per year (except in the case of Platt, whose rights vest at the rate of 20% per year), but if a Special Event occurs or an employee is terminated without cause, all Stock Appreciation Rights vest immediately under the SAR Plan.

Viewed pragmatically, to the extent that each litigant seeks preliminary injunctive relief, they are all striving to obtain an advantage in determining who will be elected as three Class I directors of a 10-person Board with three-year staggered terms and whether the SAR Plan will be adopted at TI's May 31st annual meeting. Keeping in mind the limited nature of each party's litigation objective, attention is now turned to the propriety of granting injunctive relief to TI.

■ The Third Circuit Court of Appeals opinion in *A. O. Smith Corp. v. Federal Trade Commission*, 530 F.2d 515 (3d Cir. 1976), provides the starting point for the analysis of any request for preliminary injunctive relief in this Circuit. That standard requires the party seeking preliminary relief to demonstrate:

(1) that he is likely to prevail on the merits of the controversy;

(2) that without the requested relief, he will suffer irreparable injury *pendente lite*;

(3) that if the Court grants the requested relief, other interested parties to the litigation will not be substantially harmed;

(4) that the public interest will not be harmed by the grant of the requested relief.

*A. O. Smith Corp. v. Federal Trade Commission, supra*, at 525; accord, *Constructors Association v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978); *Glasco v. Hills*, 558 F.2d 179, 180 (3d Cir. 1977); *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir. 1976).

■ Under this standard, TI's claim for injunctive relief must fail in the absence of the requisite showing of irreparable harm. The case law of this District teaches that when a violation of the Commission's proxy rules has been established, it is well within the equitable power of the Court to void the results of a shareholders' vote and require both a new solicitation of proxies and a second shareholder vote. TI has not shown that any action taken by the shareholders at their May 31st meeting will be beyond rectification if a new solicitation of proxies and shareholders' meeting is ordered after a final hearing by this Court. In denying preliminary relief in a similar case, Judge Steel of this District stated:

> If the voting of the proxies should be temporarily restrained and the annual meeting stayed for a reasonable time and it later appeared that the solicitation was valid, the corporation would be put to a certain amount of unavoidable expense and possible embarrassment with its stockholders. The stockholders would necessarily have to be given some advice why the meeting would not be held as scheduled, and probably informed that the proxies were under a cloud. This embarrassment, although it might be alleviated by a later notice, probably could not be completely cured. . . . On the other hand, if the meeting is held and

stock and/or securities convertible into voting securities of the Company (unless the acquisition is pursuant to a private placement authorized by the Board of Directors); (iv) the sale or disposition by the Company of at least 75% of the book value of the assets of the Company, as reflected on the most recent balance sheet of the Company prepared in accordance with generally accepted accounting principles and re-

lease to the public on a quarterly or annual basis, in other than the ordinary course of business; and (v) the purchase or redemption by the Company, within any 24-month period, of more than 50% of the aggregate number of voting securities of the Company that are issued and outstanding.

Doc. 1, Exh. D, p. 1–2.

the proposals of the management carried and the Court finds on final hearing that the management proxies were improperly solicited and voted the situation would be within the power of the Court to cure in some manner.

*Elgin National Industries, Inc. v. Chemetron Corp.*, 299 F.Supp. 367, 374 (D.Del. 1969) (citations omitted). Judge Latchum's opinion in *Dillon v. Berg*, 326 F.Supp. 1214 (D.Del.1971), demonstrates how the Court's equitable powers may be exercised to effect such a cure by setting aside an annual meeting and requiring the resolicitation of proxies prior to the convening of a new meeting. *Id.* at 1225.

Texas International nonetheless articulates several types of injury that the company contends cannot be remedied in the manner anticipated by the *Elgin* and *Dillon* cases, *supra*.[15] The Court, however, does not view any of these claims as describing the irreparable harm necessary to warrant the issuance of a preliminary injunction.

First, TI asserts that the "proxies will have been procured by the Committee on the basis of false and misleading statements and the failure to disclose material facts to TI stockholders." [16] The mere presence of a § 14(a) violation does not, of course, permit the grant of injunctive relief under the *A. O. Smith* standard, but at oral argument, TI contended that the psychological advantage accruing to Ling-Bertoglio, should they win in the initial election, would be impossible to overcome when a resolicitation was ordered and a new meeting scheduled. TI's counsel suggested that a psychological barrier would be raised to preclude a shareholder's changing a vote once cast, even in the face of newly circulated proxy statements that might initially have led the shareholder to cast his vote differently. The simple answer to this contention is that the suggestion of a psychological disadvantage is not the type of immediate irreparable harm that can be permitted to support extraordinary preliminary injunctive relief.

Next, TI claims that the election of the Ling-Bertoglio candidates to the Board of Directors would displace the company's senior operating management from participation on the Board, and would also give Ling and Bertoglio access to confidential internal operating data of TI.[17] The Ling-Bertoglio commitment at oral argument to refrain from asserting a right to take their seats, should they be elected at the May 31st meeting, until TI received a decision on the new motion for preliminary injunction effectively removes the threat of these types of harm. Ling-Bertoglio's counsel conceded that the presently seated members of the Board would be viewed as serving until "their successors were qualified," [18] and presumably the managerial integrity and the confidentiality of TI would be adequately protected. Whatever the merits of defendant's claim that irreparable injury would occur if the Ling-Bertoglio candidates were seated, they need not be considered given the Ling-Bertoglio position.

Finally, TI asserts that the election of the Ling-Bertoglio candidates would create "a period of hiatus and uncertainty" that would "have a substantial impact on TI's ability to retain employees, hire new employees, and conduct normal business with the financial community." [19] In support of these assertions the defendant cites the affidavits of Earl E. DeFrates and Rolf N. Hufnagel, as well as portions of the deposition of Robert C. Gist. In substance, those documents describe several difficulties involving financing and employee recruitment encountered by TI since the beginning of the present proxy contest. Mr. DeFrates, who is Senior Vice President and Chief Financial Officer for TI, describes a series of negotiations with several unnamed "major commercial banks" in an effort to acquire a substantial loan for the company. He reports that "[t]he loan officer at the

---

**15.** Doc. No. 29, ¶ 44.

**16.** Doc. No. 29, ¶ 44(a).

**17.** Doc. No. 29, ¶ 44(b) and (e).

**18.** May 25, 1979 Transcript of Hearing, pp. 138–39.

**19.** Doc. No. 29, ¶ 44(c) and (d).

lead bank in the potential lending syndicate told me that his bank would not participate in the loan if Ling and Bertoglio became associated with the company and that the Ling-Bertoglio situation had hindered his ability to put together the bank syndicate." [20] Mr. DeFrates also recites that an officer of another bank, First National Bank of Chicago, told him in substance "that if Ling became associated with TI he was not certain that First Chicago would be interested in a continuing banking relationship with TI." [21] Mr. Gist's deposition also describes these difficulties in securing financing, as reported to him by Mr. De-Frates, and likewise expressed a concern for the uncertainty created by the Ling-Bertoglio matter. Mr. Gist, however, suggests that the company's difficulty in obtaining financing was also due, in part, to TI's unwillingness to provide additional demanded collateral for the loan.[22] Mr. Hufnagel's affidavit in his capacity as TI's Vice President of Business and Administration focuses on employee recruiting problems, asserting that "several prospects for important engineering positions at the Company are not interested in further efforts toward employment with the Company until after the resolution of the Ling-Bertoglio matter," [23] and that recruitment efforts have temporarily been suspended.

These types of harm occur in varying degree whenever there is knowledge of a potential change in management or in the composition of the body which establishes policy for a corporation. Focusing on future harm that will occur in the absence of an injunction, rather than that which has already accrued to TI, it is impossible to conclude that a failure to enjoin voting of the Ling-Bertoglio proxies at the May 31st meeting will have an immediate and irreparable impact upon the relationship of TI with the financial community and on the company's personnel practices.

In summary, the Court views the assertions of irreparable injury advanced by Texas International as insufficient to warrant the grant of preliminary injunctive relief, particularly when compared to the expense and dislocation involved in ordering an immediate resolicitation of proxies and rescheduling of the meeting, and when viewed in light of the possibility that TI's claims may be mooted at the May 31st meeting if none of the Ling-Bertoglio candidates is elected to the Board. Because TI has failed to carry its burden of showing irreparable harm under the *A. O. Smith* standard for preliminary relief, there is no need to consider the further question whether it has demonstrated a probability of success on the merits, and TI's motion for a preliminary injunction will be denied. Because Messrs. Ling and Bertoglio no longer seek a preliminary injunction unless such relief is granted to TI, their motion will also be denied.

---

20. DeFrates Aff. ¶ 5.

21. *Id.* at ¶ 8.

22. Gist Dep., pp. 186–87.

23. Hufnagel Aff. ¶¶ 6 and 7.