**INITIO, INC., Plaintiff,**

v.

**John R. HESSE, William Frazier, Christopher D. Illick, Milton P. Brown, Richard O'R. Dowling, John P. Miller, John H. Gerbeth, Robert Fleming, Incorporated and American Garden Products, Inc., Defendants.**

**Civ. A. No. 79–219.**

United States District Court, D. Delaware.

July 20, 1979.

Irving Morris and Joseph A. Rosenthal of Morris & Rosenthal, P. A., Wilmington, Del., and Melvyn I. Weiss, Robert P. Sugarman, and Craig L. Tessler of Milberg, Weiss, Bershad & Specthrie, New York City, for plaintiff.

A. Gilchrist Sparks III of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and James D. St. Clair, Jeffrey Rudman, John M. Westcott, Jr., and Richard Johnston of Hale & Dorr, Boston, Mass., for defendants John R. Hesse, William Frazier and American Garden Products.

Rodman Ward, Jr., Louis A. Goodman, and John H. Small of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants Christopher D. Illick, Milton P. Brown, Richard O'R. Dowling, John P. Miller and John H. Gerbeth.

## OPINION

LATCHUM, Chief Judge.

On May 9, 1979, Initio, Inc. ("Initio") commenced this action against American Garden Products [1] ("AGP"), seven of the eight members of the Board of Directors of AGP [2], and Robert Fleming, Incorporated ("Fleming"), an investment banking company. (Docket Item 1). Initio's complaint seeks an injunction prohibiting a public offering of securities pursuant to a preliminary Registration Statement and Prospectus filed with the Securities and Exchange Commission on April 26, 1979, on the grounds that the offering is an improvident business transaction and that the Registration Statement is false and misleading. (*Id.*). Plaintiff also requests an injunction against the use of the proceeds of the proposed offering to purchase a certain outstanding promissory note. (*Id.*).

---

1. Although AGP is named as a defendant, Initio states in its complaint that it is bringing this action "derivatively on behalf of AGP" as well as "in its own right." (Docket Item 1, ¶ 7).

2. The other member of the Board who was not named as a defendant is Marvin Teget. (Docket Item 41, p. 1).

Initio promptly moved for a preliminary injunction on May 10, 1979. (Docket Item 2). At the same time Initio requested the Court to permit it to engage in expedited discovery prior to a hearing on its motion. The expedited discovery request was granted on May 11, 1979 (Docket Item 6) and on the same day a further order was entered setting the hearing on the preliminary injunction for June 11, 1979 (Docket Item 4).

A hearing was subsequently held on June 13, 1979.[3] At that hearing Initio stated that it was limiting its application to a request that AGP be enjoined from purchasing a certain outstanding note and to a request that AGP be ordered to provide more complete disclosures in its preliminary Registration Statement. (Docket Item 56, pp. 7–8, 59–60). Initio specifically stated that it would not attempt to prove at this time that the proposed offering should be enjoined. (*Id.*, pp. 7–8).

While neither party presented witnesses at the hearing, both accepted the opportunity to fully present their positions. (*See*, Docket Item 56). In addition, the parties filed all of the depositions that were taken prior to the hearing and all of the documents that were produced. Finally, the parties filed extensive briefs setting forth their respective views of the facts and the law and they have supplemented their submissions with affidavits. The Court having reviewed all of the filed documents, it is in a position to rule on Initio's motion. This Opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

## I. BACKGROUND FACTS

AGP is a Delaware corporation which is engaged in the business of growing and distributing horticultural products. (Docket Item 45, Ex. 3, p. 4). Its present operations actually consist of two closely related enterprises. (Docket Item 39, Ex. 1, p. 10). The first involves the growing and distributing of outdoor nursery products to garden centers, retail nurseries, chain stores, professional users and governmental agencies. (Docket Item 39, Ex. 1, pp. 2, 13). This part of the business is conducted on a nationwide basis through the following three subsidiary companies: (a) American Garden Cole, Inc., which has its headquarters in Circleville, Ohio; (b) American Garden Cal-Turf, Inc., which is located in Ventura, California; and (c) American Garden Perry's, Inc., which has its principal production facilities in La Puente, California. (Docket Item 39, Ex. 1, p. 2).

The second business involves the selling of seeds and bulbs nationwide by means of mail order catalogues. (Docket Item 39, Ex. 1, p. 2). This business is conducted through AGP's subsidiary, Gurney Seed & Nursery Company, Inc., located in Yankton, South Dakota. (*Id.*).

These two business enterprises were developed by AGP primarily through a process of acquiring other companies. (Docket Item 39, Ex. 1, p. 4). Indeed, between 1968 and 1978 AGP acquired eight other companies. (*Id.*). This process of expansion was generally successful. In 1975, however, AGP experienced a decline in profits. (*Id.*). At the same time AGP had a need for additional capital to continue its operations. (*Id.*). It therefore sought a loan from DeRance, Inc. ("DeRance"), a charitable foundation based in Milwaukee, Wisconsin. (*Id.*). DeRance loaned AGP 1.5 million dollars and in exchange it received a long-term subordinated note ("DeRance Note") which carried an interest rate of 9%. The DeRance Note is a lengthy document containing a number of very restrictive covenants. In addition, it also contained a provision which would allow DeRance to convert the note into stock if the price of AGP's stock reached $15.00 per share. (*Id.*).

AGP experienced even a less profitable year in 1976 than it did in 1975. The Company was forced to write off $1,000,000 worth of inventory which did not meet its quality standards (*Id.*, p. 5), resulting in a

---

3. The hearing was delayed for two days because a dispute arose between the parties as to whether certain documents sought by Initio for discovery purposes were privileged. (*See*, Docket Items 33, 34, 35).

loss of $600,000 for the year. By the end of 1976, AGP had also incurred a substantial amount of short-term bank loans. (*Id.*, pp. 5–6).

All of these problems led to a substantial refinancing plan in 1977. Under that refinancing plan a group of banks provided AGP with a line of short-term revolving credit of up to $7,000,000, at an interest rate of 1¼% above the prime rate. (*Id.*, pp. 6–7). The plan also placed certain limits on AGP's right to pay dividends and to make expenditures on fixed assets. (*Id.*, p. 7). Finally, the plan required AGP to decrease the ratio of its total liabilities to its capital base. (*Id.*).

AGP's financing efforts during 1976–1977 also forced it to obtain amendments to the DeRance Note on several occasions. (Docket Item 39, Ex. 1, p. 4). In exchange for granting these amendments DeRance obtained changes to the note's provisions. First, it obtained an increase in the rate of interest to 10%. Second, it obtained the right to convert its note to stock if the price reached $11 per share. Finally, it obtained the right to have two representatives on AGP's Board. (Docket Item 1, ¶ 22; Docket Item 49A, p. 125).

In 1978 the Company seriously began to consider the possibilities of obtaining long-term financing. John R. Hesse, the President and chairman of the Board of AGP presented three refinancing proposals to the Board in September 1978. (Docket Item 79, pp. 32–34). No action was taken on those proposals at that time. (*Id.*, pp. 35–36). In December of 1978, however, the Board voted to proceed with preparations for a public offering. (Docket Item 48A, Ex. 1, p. 6).

Mr. Hesse went ahead with those preparations and in March of 1979 he presented a proposal to the Board for a public offering of $13,000,000 of subordinated sinking fund debentures and common shares. At the same meeting Mr. Hesse also proposed that a portion of the proceeds from the offering be used to purchase the DeRance Note at a price of approximately $2,000,000. Both proposals were initially approved by the Board by a vote of 4 to 2. (Docket Item

48A, Ex. 3, p. 4). Almost immediately thereafter, however, the Board decided to table the approvals pending further consideration of various other alternatives. (*Id.*).

At subsequent meetings the discussion of the two proposals centered on the question of whether the DeRance Note should be purchased. Two of the directors expressed strong opposition to the purchase. (Docket Item 44, pp. 39–40; Docket Item 47, pp. 118–20). One of those directors, Walter H. Helmerich III, stated that he opposed the purchase because the price was "outrageous" and because two members of the Board were representatives of DeRance. (Docket Item 48, pp. 27, 31–33). The other director, Roy B. Simpson, stated that he opposed the purchase because he did not think that the restrictions in the note were so burdensome that they justified the price. (Docket Item 52, pp. 57–58).

Both of those directors resigned from the Board within a few months after the dispute developed. Neither resignation, however, was directly related to the dispute. Mr. Helmerich resigned on April 24, 1979 after he sold all of his stock in AGP to Initio. (Docket Item 48, pp. 45–46). Mr. Simpson resigned on March 20, 1979 for reasons which are not clear. (*See* Docket Item 52, pp. 66–67; Docket Item 46, pp. 33–35). It does not appear, however, that he resigned because he was opposed to the purchase of the DeRance Note.

At the next meeting of the Board on April 24, 1979 the Board heard a report on the advisability of going ahead with the public offering and of purchasing the DeRance Note. (Docket Item 45, Ex. 1, pp. 3–5). The Report on the proposed purchase of the DeRance Note was given by an independent company called T. A. Associates (*Id.*, p. 4). Mr. Miller and Mr. Dowling, the representatives of DeRance, were then excused from the meeting while the merits of the purchase were discussed. (*Id.*, p. 7). Following the discussion, Brown, Gerbeth, Hesse, and Illick voted in favor of both the public offering and the purchase of the DeRance Note. (*Id.*, p. 7). Mr. Teget abstained from both votes because he had

misgivings about the wisdom of the purchase. (Docket Item 53, p. 24). Approximately two weeks after this meeting Initio filed the present suit.

The Court of Appeals for the Third Circuit has announced the standard to be applied in determining preliminary injunction motions in *A. O. Smith Corp. v. Federal Trade Commission*, 530 F.2d 515 (C.A.3, 1976). In that case the Court held that a party is not entitled to a preliminary injunction unless he establishes that:

(a) he is likely to prevail on the merits;

(b) he would suffer irreparable injury if the injunction is not granted;

(c) other parties to the litigation will not be substantially harmed by the issuance of the injunctions; and

(d) the public interest would be served by the injunction.

530 F.2d at 525; *see also, Bertoglio v. Texas International Company*, 472 F.Supp. 1017 at 1021–1022 (D.Del.1979); *Avins v. Widener College, Inc.*, 421 F.Supp. 858, 860–61 (D.Del.1976). Initio's motion must be considered in light of that standard.

## II. THE DeRANCE NOTE

■ Initio first claims that the proposed purchase of the DeRance Note is so improvident that it would amount to a waste of corporate assets. To prevail on this claim Initio must establish either: (a) that there was self-dealing by the members of the Board or that the members of the Board did not make an informed business judgment before they voted to purchase the Note, and thereby shift the burden to the Board to prove that the purchase is fair to AGP;[4] or (b) prove that the proposed purchase is grossly disadvantageous to AGP.[5] Predictably, Initio contends that it can prove that there was self-dealing by the Board, that the directors failed to make an informed judgment, and that the proposed purchase is grossly disadvantageous to AGP. Each

of those possibilities will now be discussed in turn.

■ Initio contends that it will be able to prove that there was self-dealing by the Board because it can show that two of the Board members—Messrs. Miller and Dowling—were nominated by DeRance, and because it can prove that another member of the Board, Mr. Illick, is the president of an investment banking company which would be one of the underwriters of the public offering. (Docket Item 43, p. 62). The Court does not agree that that evidence will be sufficient to establish self-dealing.

The minutes of the April 24, 1979 Board meeting indicate that Messrs. Miller and Dowling left the room during the final discussion of the proposed purchase and the minutes also indicate that neither Messrs. Miller nor Dowling voted on the proposal. (Docket Item 45, Ex. 1, p. 7). Furthermore, there is nothing in the record at this point to indicate that the other members of the Board were influenced by Messrs. Miller or Dowling.

The evidence with regard to Mr. Illick is equally insubstantial. It is true that Mr. Illick is the president of a firm that would be one of the underwriters of the proposed public offering, and he, therefore, would have some personal interest in voting in favor of the public offering. (*See* Docket Item 50, pp. 3, 23). There is nothing in the record, however, to suggest that Mr. Illick had any personal interest that would cause him to vote in favor of the purchase of the DeRance Note. The Court concludes, therefore, that it is not likely that Initio will be able to establish that there was any self-dealing involved in the Board's decision to purchase the DeRance Note.

Initio also contends that it will be able to establish that the members of the Board did not make an informed business judgment about the proposed purchase before they voted for it. (Docket Item 43, p. 42). The

---

4. *See, Kaplan v. Goldsamt*, 380 A.2d 556, 568 (Del.Ch.Ct.1977); *Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 609 (Del.Ch.Ct.), aff. 316 A.2d 619 (1974); *Puma v. Marriott*, 283 A.2d 693, 695 (Del.Ch.Ct.1971).

5. *See, Gimbel, supra*, 316 A.2d at 610; *Muschel v. Western Union Corporation*, 310 A.2d 904, 909 (Del.Ch.Ct.1973).

record at this point, however, does not appear to support this contention.

The record demonstrates that the Board considered the proposed purchase during at least two separate Board meetings in March and April of 1979. (Docket Item 48A, Ex. 3; Docket Item 45, Ex. 1). On both occasions the Board heard arguments for and against the purchase. (*Id.*). In addition, at the April meeting the Board heard the opinion of an independent financial consultant on both the propriety and the financial effect of the purchase. (Docket Item 45, Ex. 1, pp. 5, 7). The Court, therefore, concludes that it is unlikely that Initio will be able to prove that the members of the Board failed to make an informed business judgment before they voted in favor of purchasing the DeRance Note.

■ Initio's final contention with regard to the DeRance Note is that it will be able to prove that the proposed purchase is grossly disadvantageous to AGP. (Docket Item 43, p. 46). In support of that contention Initio points to the fact that it is undisputed that the proposed purchase of the DeRance Note involves a payment by AGP of a $500,000 premium to DeRance—an amount that is equal to one-third of the face value of the Note. It also points to the fact that it is undisputed that the Board plans to purchase the Note with money which carries an interest rate which is 2¼% greater than the interest rate which the Note itself bears. Initio claims that these two facts are sufficient to conclusively establish that the proposed purchase is grossly disadvantageous to AGP. The Court is unable to agree.

There is no doubt that the above evidence establishes that the proposed purchase involves substantial costs to AGP. (*See* Docket Item 42, pp. 13–14). The defendants, on the other hand, contend that those costs are justified by the benefits that will be derived from the purchase of the Note. (*See* Docket Item 39, pp. 47–48).

There are three benefits that AGP will presumably derive from the proposed purchase. The first benefit is based on the fact that the DeRance Note can be converted into between 136,000 to 150,000 shares of AGP stock if the price of the stock reaches $11 per share. The purchase of the Note would eliminate the possibility that DeRance would convert the Note and thereby cause a significant dilution in the shareholders' equity.[6] The second benefit is the elimination of the various restrictions that are contained in the Note (*see* Docket Item 39, Ex. 1, p. 5); and the final benefit that AGP allegedly will derive from the purchase is an increase in the marketability of both the present proposed offering and any future financings that might be required. (Docket Item 45, Ex. 1, p. 5; Docket Item 39, Ex. 4).

While the Court is not convinced at this point that those benefits are as valuable to AGP as the defendants contend, nevertheless, the evidence does indicate that those benefits would be of substantial value to AGP. (Docket Item 49A, pp. 122–135; Docket Item 39, Exs. 4 & 5). The Court concludes, therefore, that Initio has failed to establish that it is likely that it will be able to prove that the proposed purchase is grossly disadvantageous to AGP, and consequently, it has failed to establish that it is likely to prevail on the merits with regard to its first claim.

The next question that the Court must consider is whether Initio has established that it or AGP will suffer irreparable harm if an injunction is not granted. The only harm that Initio has identified as potentially arising from the purchase is a wasting of corporate assets. That potential harm is not irreparable since the loss could be recovered in a damage action against the Board. The Court thus concludes that Initio has failed to establish that it or AGP will suffer irreparable harm if an injunction does not issue.

■ The Court further concludes that Initio has failed to establish that AGP would not be substantially harmed if an injunction

---

**6.** There would be approximately 33,000 shares issued in connection with the purchase alone so the net savings of dilution would be between 103,000 and 117,000 shares.

*were* granted. There is evidence in the record that the marketability of the proposed public offering would be seriously affected if the DeRance Note was to remain outstanding. (Docket Item 39, Exs. 4 & 5). In addition, if an injunction were granted it is possible that DeRance would thereafter convert the Note into stock and thereby cause a significant dilution of the shareholders' interests. Finally, an injunction would cause AGP to continue to bear the burden of the restrictions that are contained in the DeRance Note. These three harms when viewed as a whole are clearly substantial.

Finally, the Court concludes that Initio has failed to establish that the public interest would be served in any way by the granting of an injunction against the proposed purchase. Hence, the Court will deny Initio's motion for a preliminary injunction prohibiting the proposed purchase of the DeRance Note.

### III. THE REGISTRATION STATEMENT

Initio's second claim is that the defendants caused AGP to violate Section 10(b) of the Securities Exchange Act of 1934[7] (the "34 Act") and Rule 10b–5,[8] which was promulgated thereunder, by preparing and issuing a preliminary registration statement that is false and misleading.[9] (Docket Item 43, pp. 49–60). Initio has failed to establish that it is likely to succeed on this claim, however, because it has failed to convince the Court that it is a member of the class of plaintiffs who may maintain a private cause of action for a violation of Section 10(b).

Section 10(b) of the 1934 Act does not provide an express civil remedy for its violation and Congress apparently did not consider the problem of private suits when the law was passed.[10] *See*, Note, Implied Liability Under The Securities Exchange Act, 61 Harv.L.Rev. 858, 861 (1948); S.Rep.No. 792, 73d Cong., 2d Sess. 5–6 (1934). Moreover, it also appears that the Securities Exchange Commission ("SEC") did not consider the problem of private suits when it promulgated 10b–5.[11] SEC Securities Exchange Act Release No. 3230 (1942); Conference on Codification of the Federal Securities Laws, 22 Bus.Law. 793, 922 (1967).

7. 15 U.S.C. § 78j(b).

8. 17 C.F.R. § 240.10b–5.

9. Initio also contends in its brief that it is entitled to an injunction under Sections 11 & 12 of the Securities Act of 1933, 15 U.S.C. §§ 77k–77*l*. (Docket Item 43, p. 60). That contention is clearly frivolous because both sections provide causes of action only for purchasers of securities. In its complaint Initio also alleges that the Registration Statement violates Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q. (Docket Item 1, pp. 11–16). Initio has not argued, however, either in its brief or at the hearing that an injunction should be granted on that ground. The Court, therefore, will not decide whether a private cause of action may be maintained for violation of Section 17(a). *See, Schultz v. Cally*, 528 F.2d 470, 475 n. 11 (C.A.3, 1975).

10. Section 10(b) reads as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

15 U.S.C. § 78j(b).

11. Rule 10b–5 reads as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates as a fraud or deceit in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b–5.

Nevertheless, the federal courts began to imply a private cause of action as early as 1946. *See, Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa.1946).

At the same time, however, the courts also recognized that it was necessary to place some limits on this judicially created cause of action. The most significant of these limitations was established by the Second Circuit Court of Appeals in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (1952). In that case the Second Circuit held that Section 10(b) provided a private cause of action only for those persons who were either defrauded buyers or sellers of securities. *Id.*, at 463–64. That view was eventually adopted by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

In this case Initio concedes that it is not a buyer or seller within the meaning of *Blue Chip.* Initio contends, however, that it is not precluded from bringing this action because it is bringing this case on behalf of AGP and AGP is a seller within the meaning of *Blue Chip.* The Court does not agree.

■ Prior to the *Blue Chip* decision some lower courts had allowed a shareholder of a corporation to bypass the buyer-seller rule by bringing a derivative action on behalf of the corporation. *See, Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (C.A.2, 1968); *Pappas v. Moss*, 393 F.2d 865, 869 (C.A.3, 1968). The *Blue Chip* Court recognized that "exception" to the buyer-seller rule and it did not overrule it. *Blue Chip, supra*, 421 U.S. at 738, 95 S.Ct. 1917. Presumably, then, that exception to the buyer-seller rule may still be utilized in appropriate cases. The present action, however, is not such a case.

Each of the cases in which a shareholder has been allowed to bypass the buyer-seller rule by bringing a derivative action involved a situation where the corporation was the *victim* of a fraudulent sale. *See, Cramer v. GTE*, 582 F.2d 259, 270–71 (C.A.3, 1978); *Schoenbaum, supra*, 405 F.2d at 218–19; *Pappas, supra*, 393 F.2d at 869; *Ruckle v. Roto American Corp.*, 339 F.2d 24, 27–29 (C.A.2, 1964). The corporation in each of those cases, therefore, would have clearly qualified as a defrauded buyer or seller within the meaning of the rule. In this case, on the other hand, Initio does not claim that AGP is about to become the *victim* of a fraudulent sale, but rather that AGP is about to perpetrate a fraud on the public and that AGP may eventually be injured if there are resulting lawsuits. In light of this distinction, the Court concludes that AGP would not qualify as a buyer or seller under the rule and consequently finds that Initio cannot obtain the necessary standing to bring this action by means of a derivative suit.

■ Alternatively, Initio contends that it has standing under a line of decisions which holds that a non-buyer or seller may bring a Section 10b suit for an injunction rather than damages, if the person suffered an injury which was causally connected to a fraudulent sale. *See, Kahan v. Rosensteil*, 424 F.2d 161 (C.A.3), *cert. den.*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Crane Co. v. Westinghouse Air Brake Company*, 419 F.2d 787 (C.A.2, 1969). Once again, however, the Court does not agree.

In the first place there is some question as to whether the *Kahan* line of cases has survived the *Blue Chip* decision.[12] While it is true that the *Blue Chip* opinion specifically refers only to damage actions, it seems evident that much of the analysis of that opinion applies to an action for injunctive relief.[13] (*See* Docket Item 68, pp. 7–11). Moreover, even if it is assumed that the *Kahan* line of cases survives *Blue Chip*, it is still not clear that Initio would have standing under those cases.

---

**12.** The Third Circuit has noted the question, but it has not yet found it necessary to resolve it. *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 194 (1976).

**13.** *But compare, Alaska Interstate Company v. McMillian*, C.A. No. 75–188, unreported opinion at 13–14 (D.Del., Dec. 12, 1975) *with Harriman v. E.I. duPont de Nemours and Company*, 411 F.Supp. 133, 157 (D.Del.1975).

In *Kahan* it was alleged that during the course of a tender offer misrepresentations were made to the plaintiff and to the other shareholders of a corporation in an effort to get them to tender their stock at a low price. *Kahan, supra*, 424 F.2d at 164. The plaintiff did not tender any of his shares in the corporation in response to the tender offer. Nevertheless, the Third Circuit concluded that the plaintiff should be allowed to bring an action for an injunction, because he alleged that he had suffered an injury that was *directly caused* by an alleged violation of Section 10(b) and because such an action would be consistent with the policy of the Securities Exchange Act. *Id.* at 173.

The present case is significantly different from *Kahan*. Initio does not allege that any misrepresentations were directed at it. Rather, it alleges that misrepresentations will be made to the general public in the offering documents. More importantly, Initio does not allege that it has suffered or will suffer a direct injury as a result of those misrepresentations. Instead, Initio alleges that the general public will be directly injured and that Initio may suffer an indirect injury if the value of its investment in AGP decreases as the result of possible lawsuits against AGP. Finally, unlike the *Kahan* case, it is not clear that it would be consistent with the policy of the Securities Acts to grant Initio standing in this case.

The alleged misrepresentations in this case were made in a preliminary Registration Statement that has been filed with the SEC but which has not yet become effective. The SEC has been supplied with all the information that is in the record before this Court [14] and it is currently reviewing the Registration Statement as it is required to do under the 1933 Act. *See*, 15 U.S.C. § 77h. In these circumstances it is questionable whether it would be consistent with the policy of the Securities Acts to accord Initio standing to maintain this action since it would essentially require the Court to perform a function with the SEC

is already performing. The Court concludes, thus, that the *Kahan* line of cases do not apply and consequently that Initio does not appear to have standing to bring a private cause of action under Section 10(b).

The Court also concludes that Initio has failed to establish that either it or AGP will be irreparably harmed if the Court does not order a more complete disclosure. As the Court has already noted, the SEC has been supplied with all of the information which is in the record in this case and it is currently in the process of reviewing the allegedly defective Registration Statement. Hence, it seems likely that if there are defects in the Registration Statement the SEC will find them and order the defendants to correct them before it allows the Statement to become effective. If that occurs AGP and Initio will not suffer any harm as a result of the denial of injunctive relief.

Moreover, even if the SEC fails to require sufficient disclosure before it allows the Registration Statement to become effective, neither AGP nor Initio would be irreparably harmed. At most AGP might be forced to pay damages to those persons who purchase the securities which are part of the proposed offering.[15] That loss presumably could be recovered in a damage action against the defendants.

Finally, the Court concludes that Initio has failed to establish that granting the preliminary relief it requests would serve the public interest to any significant degree. The Court, therefore, finds that Initio's motion for an order requiring the defendants to make a more complete disclosure must be denied.

Accordingly, an order will be entered denying plaintiff's motion for a preliminary injunction.

---

14. *See* Docket Item 39, Ex. F; Docket Item 56, pp. 60–62.

15. *See*, 15 U.S.C. § 77k.